IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SYNQOR, INC. | § | |
| | § | |
| v. | § | No. 2:11CV54 |
| | § | |
| CISCO SYSTEMS, INC., ET AL | § § | |

# ORDER

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. The following motion is before the Court: SynQor, Inc.'s Motion to Compel Cisco and for Sanctions (Docket Entry # 247). Plaintiff SynQor, Inc. ("SynQor") asserts Defendant Cisco Systems, Inc. ("Cisco") failed to fully respond to SynQor's discovery requests and failed to provide a properly prepared Rule 30(b)(6) witness on SynQor's noticed topics. The Court, having reviewed the relevant briefing, is of the opinion the motion should be **DENIED**.

## I. SYNQOR'S MOTION

SynQor served Cisco with interrogatories and a Rule 30(b)(6) deposition notice asking for information regarding which of SynQor's accused products are shipped to, from, or through the U.S. and quantifying the units involved. According to SynQor, at the deposition, Cisco provided a witness who testified that, while there are additional units shipped through the U.S., he was not prepared to and could not identify which additional units pass through the U.S., what routes they follow, or what information Cisco has regarding the shipment of these units through the U.S. SynQor requests the Court order Cisco to provide the requested discovery and pay SynQor's attorneys' fees and costs.

In response, Cisco asserts it has fully complied with its discovery obligations in this case. According to Cisco, its Rule 30(b)(6) witness, Jeffrey Purnell, was knowledgeable and testified on a wide range of topics regarding Cisco's U.S. sales. Following Mr. Purnell's deposition, Cisco agreed to produce, after a reasonable investigation into the information it has in its possession, the tracking numbers from third-party common carriers such as UPS, FedEx, and DHL.

## II. APPLICABLE LAW

FED. R. CIV. P. 26(b)(1) provides parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii). Specifically, Rule 26(b)(2)(iii) allows the Court to limit discovery if the burden or expense of the proposed discovery outweighs the likely benefits of the discovery, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

## III. DISCUSSION

SynQor seeks from Cisco information to quantify Cisco's U.S. infringements, i.e. those accused products that are made, used, sold or imported into the U.S. SynQor's interrogatory no. 3 specifically requests the following:

> For each of your end products that incorporate or have incorporated an unregulated or semi-regulated bus converter used in IBA, identify the bus converter incorporated therein and state your unit and dollar sales volume of the end product starting from July 4, 2006, . . . *whether the end product is imported into the United States* . . . .

Interrogatory No. 3 (Nov. 16, 2011) (emphasis added). SynQor subsequently asked Cisco the following:

> Identify all your uses in the United States since July 4, 2006 of unregulated bus converters, semi-regulated bus converters and replacement bus converters beyond the sales of end products you identified in response to interrogatory no. 3, including without limitation . . . all logistical/warehousing/ shipping uses (such as any end products/PIDs with them included that *pass through the U.S. for any reason*, such as testing, *warehousing or shipping*, but are not sold in the U.S.). . . .

Interrogatory No. 20 (March 4, 2013) (emphasis added). Finally, SynQor asked Cisco to explain the representations in its declaration provided to the Court in Cause No. 2:07cv497 (the '497 case) that "approximately fifty percent of Cisco's sales of products incorporating the accused bus converters . . . *never enter the United States*." Interrogatory No. 21 (March 22, 2013)(emphasis added). According to SynQor, Cisco has not identified its products that are imported into the U.S. and ultimately shipped outside of the U.S. in response to these interrogatories (the pass-through-the-U.S. units), despite Cisco's witness acknowledging at the recent deposition that there are such units.

SynQor served Cisco with a Rule 30(b)(6) deposition notice requesting a witness to explain Cisco's sales data and to identify all of its U.S. activity. References to "Cisco's US sales" included sales made to the United States, sales made from the United States, and sales that are shipped from outside the United States to a location outside the United States *but pass through the United States* in transit. (SynQor's 1st Amended Notice of Deposition of Cisco at 3). SynQor requested that Cisco provide a witness prepared to testify on topics including the following:

- the topics of SynQor's interrogatory nos. 3, 20, and 21, and Cisco's responses thereto (topic 22);

- the actual percentage of Cisco's worldwide sales that are "Cisco's U.S. sales" (topic 9) and "[a]n accurate quantification . . . of Cisco's U.S. unit sales" (topics 10, 12, 14, 16);

- for Cisco's accused products passing through Cisco facilities in Mexico, Latin America or South America, "whether they enter the United States at any point" (topic 23); and

- for Cisco's accused products, "an accurate quantification of all such sales shipped through

3

the United States" (topic 24).

(SynQor's 1st Amended Notice at 4-5, 7). Two weeks before the deposition, SynQor sent Cisco a list of questions it would ask at the upcoming deposition. *See* Ex. 12, 5/10/13 letter. These included, for example, questions regarding how many accused products "passed through" the U.S. but were not considered sold to or from the U.S. by Cisco and what shipping routes the accused products followed. *Id*. at 21, 24-25.

According to SynQor, at Mr. Purnell's May 24, 2013 30(b)(6) deposition, SynQor learned for the first time that Cisco has been applying a special interpretation of whether or not products have been imported to the U.S. or shipped through the U.S. *See, e.g.*, Purnell Depo. at 46:23-24 (A: It depends on your definition of "through the U.S."). SynQor asserts Mr. Purnell explained that Cisco accused products may be physically shipped to the U.S., but if such products do not clear customs and instead remain in customs bonded zones, then Cisco considers them not to be imported to the U.S. *Id.* at 48:5-49:20. According to SynQor, despite all of its requests, Cisco had not investigated and could not provide testimony regarding which units those were, what routes they followed in between Cisco's facilities and/or to its customers, or whether Cisco maintained such information.

Given Mr. Purnell's alleged inability to provide information regarding which units pass through the U.S. or the routes followed by Cisco's infringing products, following the deposition SynQor wrote to Cisco requesting such information. *See* Ex. 18, 5/28/13 letter. In response, Cisco asserted Mr. Purnell was fully prepared to testify as to all of the noticed topics, and he did testify fully as to the relevant shipments to and from the U.S. Cisco further asserted whether or not units pass through customs bonded zones in the U.S. is irrelevant "because the mere act of crossing the border with goods does not constitute 'importation' for purposes of patent infringement." *See* Ex.

4

19, 5/31/13 letter at 1. Cisco also characterized SynQor's requests to determine which accused products pass through the U.S. as "new discovery requests" and told SynQor it was "investigating." *Id*. Cisco stated it intended to update its interrogatories as appropriate.

Cisco later provided updated interrogatory responses, but SynQor asserts the responses do not contain information regarding units that pass through the U.S., although it did remove the statement claiming that "Cisco maintains that its U.S. sales of relevant products over time account for approximately 50% of its worldwide sales of those products" from its response to interrogatory no. 21. *See* Ex. 22. SynQor asserts Cisco "continues to dodge the issue of units shipped through the U.S.," noting for example in response to interrogatory no. 3 that the error in its sales data caused "it to include both U.S. sales records and records for sales that were not shipped *to or from* the [U.S.]" without even acknowledging units shipped through the U.S. imported into the U.S. before being sold elsewhere. (Docket Entry # 247 at pg. 8). SynQor requests the Court sanction Cisco in the form of a fact deemed admitted. At a minimum, however, SynQor asserts the Court should order the following:

- Order Cisco to produce all information regarding the shipment of accused products to, from, and through the U.S. and provide complete responses to SynQor's interrogatory nos. 3, 20, and 21;

- Provide a sworn declaration from someone at Cisco with knowledge confirming that Cisco has investigated all information within its possession, custody, or control and does not have any further information on these topics;

- Provide a Cisco deposition witness, at Cisco's expense including associated court reporter and videographer costs, to testify regarding any new information or documents produced; and

- Pay SynQor's travel expenses and reasonable attorneys' fees associated with another deposition of Cisco and this motion.

(Docket Entry #364 at pg. 14).

During the approximately ten hours of his deposition, Mr. Purnell testified regarding units shipped to or from the U.S., the origin and destination of its various devices, and how to interpret the various documents Cisco had produced detailing the shipments of its devices. According to Cisco, Mr. Purnell further testified about the following shipping information:

- How products manufactured by Cisco's contract manufacturers ("CMs") get to the ultimate end-customer. Cisco's CMs generally manufacture the printed circuit boards that are at issue and ship them to Cisco's DF sites (direct fulfillment facilities); the DF sites assemble/package the circuit boards into the accused products and send them to Cisco's SLCs (shipping logistics centers); Cisco's SLCs either ship them to Cisco's customers or to other Cisco SLCs that in turn ship them to Cisco's customers. (Purnell Depo. at 23:9-24:20);

- Cisco's CMs that have made the products containing the accused bus converters since 2006 and the documents Cisco has produced that include that information (*Id*. at 20:25-22:1);

- Cisco's DFs that have distributed the products containing the accused bus converters since 2006 and the documents Cisco has produced that include that information (*Id.* at 25:1-15);

- Cisco's Orion records and how they show the origin SLC and the destination SLC (*id.* at 56:22-57:5); according to Mr. Purnell, by looking at these records, one can ascertain how many products containing the accused bus converters Jabil Mexico handles annually as a DF. (*Id*. at 52:24-53:2);

- All of the products containing the accused bus converters that Jabil Mexico handles as the DF go to the SLC in Jalisco as their first stop. (*Id.* at 55:5-11); and

- How Cisco's documents show which units from Jabil Mexico that are not otherwise indicated as being imported into the United States in Cisco's data are nevertheless imported to the United States, clear customs, and are then exported back to Mexico (the "U-turns"). (*Id.* at 28:13-29:7).

Mr. Purnell further explained that Cisco's shipping is handled by third-party shippers such as UPS, FedEx, DHL, and others, and the routes that Cisco's products take are defined by the carrier.

6

(Purnell Depo. at 45:13-20 & 100:25-101:11). Unless Cisco specifically requests that its shippers import goods into the United States, Cisco does not track physically whether they pass through customs bonded zones that may physically be within the United States (it tracks more from a customs perspective). (*Id.* at 73:12-74:5, 74:17-75:11, 124:2-11, 149:9-22, 325:21-326:14). Therefore, according to Cisco, to determine the number of units (if any) that actually pass through a U.S. customs bonded zone while being shipped to and from a foreign destination, SynQor must obtain shipping records from the third-party shippers such as UPS, FedEx, and DHL—not Cisco. (*See id.* at 50:10-51:8).

SynQor argues Mr. Purnell failed to investigate the extent of Cisco's shipping knowledge and was insufficiently prepared to testify concerning the noticed topics. In support of this assertion, SynQor relies on Mr. Purnell's following testimony:

> Q . . . How can we tell which ones pass through a U.S. -- what did you call them?
>
> A bonded site?
>
> A  Basically a customs bonded zone.
>
> Q. A customs -- that pass through a customs bonded zone physically in the United States?
>
> A. I don't have that data.
>
> Q. Did you try to obtain that data?
>
> A. No, I have not.

Purnell Depo. at 50:15-22. Mr. Purnell later testified that the details of these third-party shippers' shipping routes would reside with these third-party shippers, not Cisco. *Id*. at 50:23-51:2 ("Q. Who would you ask for that data? A. Our – our logistics team would need – probably need to go back to

7

the shipp[ers] and pull up all the shipping records of, you know, tracing where those shipments went."); see also id. at 74:17-75:11, 124:2-11, 325:21-326:14 ("to my knowledge, we do not track within our own business records what would actually transit through, you know, way points as part of our carrier network that are in trade-free, you know, bonded customs zones").

After investigating further, on June 7, 2013, Cisco confirmed as follows:

> [A]s Mr. Purnell made clear in his deposition, with respect to third parties, Cisco has no knowledge regarding the physical paths that third party freight companies use for shipments. . . . We have investigated and confirmed Mr. Purnell's statements in this regard. As Mr. Purnell made clear in his testimony, any information regarding the physical paths that third party freight companies may take is maintained by those companies, and not by Cisco.

(June 7, 2013 letter from McClelland to DeZern). Nevertheless, Cisco agreed to produce the tracking numbers for shipments from Cisco to end customers by June 28, 2013. *Id.*

SynQor acknowledges Cisco produced additional information after Mr. Purnell's deposition, but SynQor asserts this further illustrates that Mr. Purnell was unprepared and failed to investigate all the information in its possession, custody, or control. According to SynQor, this information, although confirming units shipped from Mexico to customers overseas are indeed shipped through the U.S., was incomplete, e.g., failing to include, for example, any information about how Cisco's infringing products are shipped to Cisco's facilities in Mexico.

The Court disagrees and finds Mr. Purnell was knowledgeable and prepared in his May 24, 2013 deposition to answer SynQor's specific questions on each of the noticed topics to the extent of Cisco's knowledge. Additionally, the Court will not require Cisco to obtain the requested information from the third parties. *See* Fed. R. Civ. P. 26(b)(2)(C). According to Cisco, four days before Mr. Purnell's deposition, SynQor served a subpoena on Jabil Circuits, Inc.—the contract

manufacturer that ships the devices at issue—to obtain the information this present motion seeks. To the extent SynQor needs additional information about the shipping routes for Cisco's products originating outside the United States and sold to locations outside the United States, it can seek that discovery directly from the third-party common carriers that are responsible for selecting those routes.

Accordingly, it is

**ORDERED** that SynQor's Motion to Compel Cisco and for Sanctions (Docket Entry # 247) is **DENIED**.

**SIGNED this 4th day of November, 2013.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE